**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph A. Pettigrew (CA 236933)
jpettigrew@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jing-Li Yu (CA 342985)
jyu@scott-scott.com
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff Police and Fire Retirement System of the City of Detroit*

[Additional counsel on signature page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Derivatively on Behalf of Nominal Defendant UBER TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DARA KHOSROWSHAHI, RONALD SUGAR, REVATHI ADVAITHI, TURQI ALNOWAISER, NIKESH ARORA, URSULA BURNS, ROBERT ECKERT, AMANDA GINSBERG, JOHN THAIN, ALEXANDER WYNAENDTS, ANDREW MACDONALD, BALAJI KRISHNAMURTHY, and PRASHANTH MAHENDRA-RAJAH,<br><br>Defendants,<br><br>– and –<br><br>UBER TECHNOLOGIES, INC.,<br><br>Nominal Defendant. | Case No. _____<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................2

III.    PARTIES ................................................................................................................3

    A.      Plaintiff ......................................................................................................3

    B.      Nominal Defendant .....................................................................................3

    C.      Director Defendants ...................................................................................3

    D.      Officer Defendants .....................................................................................4

IV.     THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS...........................5

    A.      Duties of Individual Defendants .................................................................5

    B.      Additional Duties of Board Committees.....................................................7

V.      SUBSTANTIVE ALLEGATIONS ...........................................................................8

    A.      Company Background ..................................................................................8

    B.      Uber's History of Non-Compliance............................................................9

    C.      The Culture of Non-Compliance Continues ..............................................10

VI.     BOARD CULPABILITY .......................................................................................22

VII.    SECURITIES LAW VIOLATIONS........................................................................25

VIII.   DAMAGE TO THE COMPANY ............................................................................36

IX.     DERIVATIVE ALLEGATIONS.............................................................................36

X.      DEMAND FUTILITY ALLEGATIONS ..................................................................37

XI.     CLAIMS FOR RELIEF .........................................................................................37

    COUNT I Breach of Fiduciary Duty Against All Individual Defendants ........................37

    COUNT II Corporate Waste Against the Individual Defendants ....................................38

    COUNT III Unjust Enrichment Against the Individual Defendants ................................38

    COUNT IV Violation of §14(a) of the Exchange Act Against All of the Director Defendants...............................................................................................................39

    COUNT V Violation of §29(b) of the Exchange Act Against All of the Director Defendants...............................................................................................................40

XII.    PRAYER FOR RELIEF ........................................................................................41

i

XIII.    JURY DEMAND ........................................................................................................................42

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit" or "Plaintiff"), by and through its undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Uber Technologies, Inc. ("Uber" or the "Company"), against certain current and former members of Uber's Board of Directors (the "Board" or "Director Defendants") and executive officers ("Officer Defendants," and together with the Director Defendants, "Individual Defendants" or "Defendants"), seeking to remedy breaches of fiduciary duties, unjust enrichment, corporate waste, and violation of the federal securities laws from at least 2017 through the present (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge as to the facts of its ownership of Uber stock and upon information and belief as to all other matters, based upon an in-depth review by its counsel of: (a) documents obtained pursuant to 8 *Del. C.* §220 ("Section 220") (the "220 Production"); (b) public filings made by Uber and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the Company and other related non-parties; (d) news articles, shareholder communications, and postings on Uber's website concerning the Company's public statements; (e) the proceedings in past and ongoing litigation and regulatory actions concerning the wrongdoing alleged herein; and (f) other publicly available information concerning Uber and the Defendants.

## I.    NATURE OF THE ACTION

1.    Uber is a serial compliance offender.  For years, the Company, through its management and Board, has knowingly cut compliance corners in the name of growing the Company.  The victims of this lack of compliance culture include sexual assault and harassment victims, customers with disabilities, and unwary consumers looking to subscribe to Uber One.  Despite repeated warnings from inside and outside the Company, these remain major issues and represent significant risk and actual harm to Uber and its shareholders.

2.    Among the consequences to Uber's fiduciaries breaching their bedrock duties to the Company to follow the law are thousands of lawsuits from victims of sexual assault and harassment, and suits from federal and state regulators for violations of the Americans with Disabilities Act of 1990 ("ADA") and consumer protection statutes.  Uber's reputation suffers as

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

well, with the Board being told repeatedly that less than 40% of its users think the Company takes safety seriously or makes it a priority.

3.    Meanwhile, Defendants have made false and misleading statements to the public about the above in their proxy statements, in an attempt to entrench themselves in positions of power, and to approve their own compensation, further harming Uber.

4.    Internal books and records demanded and received by Plaintiff show that Uber's fiduciaries breached their duties to the Company by either effectively failing to oversee compliance, or by actively engaging or causing Uber to engage in unlawful conduct.

5.    Plaintiff therefore brings this suit on behalf of Uber to recover damages and seek other appropriate relief for the harm caused by these disloyal fiduciaries.

**II.    JURISDICTION AND VENUE**

6.    Jurisdiction lies pursuant to 28 U.S.C. §1331.  The claims asserted herein arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78cc(b), and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.  In connection with the wrongdoing complained of herein, Defendants used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

7.    This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this District, or is an individual who maintains a place of business in this District or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

8.    Venue is proper in this jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

§78aa, as well as 28 U.S.C. §1391(b). Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) Uber is headquartered in, and therefore is a resident of, the State of California; (ii) one or more of the Individual Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Uber and its shareholders, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9. **Divisional Assignment**: This action should be assigned to the San Francisco Division of this Court under Local Rule 3-2(d), as the Company is headquartered in San Francisco County, California.

## III.    PARTIES

### A.    Plaintiff

10. Plaintiff Detroit has been a shareholder of Uber since at least 2019, and has continuously held since then. Plaintiff will continue to hold Uber shares throughout the pendency of this action. Plaintiff will fairly and adequately represent the interests of Uber and its shareholders in enforcing the rights of the Company.

### B.    Nominal Defendant

11. Nominal Defendant Uber is a Delaware corporation with its principal executive offices located at 1725 3rd Street, San Francisco, California 94158. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "UBER."

### C.    Director Defendants

12. Defendant Dara Khosrowshahi has been a director of Uber and its Chief Executive Officer ("CEO") since September 2017.

13. Defendant Ronald Sugar has been a director of Uber and the Independent Chairperson of the Board since July 2018.

14. Defendant Revathi Advaithi has been a director of Uber since July 2020. She serves on the Audit Committee.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

15.    Defendant Turqi Alnowaiser has been a director of Uber since November 2023.  He serves on the Audit Committee.

16.    Defendant Nikesh Arora has been a director of Uber since May 2025.  He serves on the Nominating and Governance and Compensation Committees.

17.    Defendant Ursula Burns has been a director of Uber since October 2017.  She serves on the Audit and Nominating and Governance Committees.

18.    Defendant Robert Eckert has been a director of Uber since March 2020.  He serves as Chair of the Compensation Committee and serves on the Nominating and Governance Committee.

19.    Defendant Amanda Ginsberg has been a director of Uber since February 2020.  She serves on the Nominating and Governance and Compensation Committees.

20.    Defendant John Thain has been a director of Uber since October 2017.  He serves as Chair of the Audit Committee.

21.    Defendant Alexander Wynaendts has been a director of Uber since March 2021.  He serves on the Audit Committee.

22.    Defendants Khosrowshahi, Sugar, Advaithi, Alnowaiser, Arora, Burns, Eckert, Ginsberg, Thain, and Wynaendts constitute all of the current members of Uber's Board and are collectively referred to herein as the "Director Defendants."

**D.    Officer Defendants**

23.    Defendant Andrew Macdonald has served as Uber's President and Chief Operating Officer ("COO") since June 2025.  Previously, he served as Senior Vice President, Head of Global Mobility from June 2019 to June 2025.  Prior to that, he served in various management and regional roles from 2012 to 2019.

24.    Defendant Balaji Krishnamurthy has served as Uber's Chief Financial Officer ("CFO") since February 2026.  Previously, he served as Vice President, Strategic Finance from September 2023 to February 2026; as Senior Director, Strategic Finance from March 2023 to September 2023; and Head of Investor Relations from December 2020 to March 2023.

25.    Defendant Prashanth Mahendra-Rajah served as Uber's CFO from November 2023

4

until February 2026.

26.    Defendants Khosrowshahi, Macdonald, Krishnamurthy, and Mahendra-Rajah are sometimes referred to collectively herein as "Officer Defendants."

27.    The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants" or "Defendants."

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.    Duties of Individual Defendants

28.    Uber's Board has adopted corporate governance guidelines (the "Guidelines") to "form the framework of governance of the Company."  According to the Guidelines:[1]

- "These cultural norms help to set a strong tone of integrity for the entire Company and extend to the Company's corporate governance.  The [Board] firmly believes that the Company must be transparent with, and accountable to, its stockholders with respect to the Company's culture and its corporate governance practices."

- The Company expects the integrity and values of its directors and senior management to remain the most important safeguard of corporate governance at Uber.

- The Board oversees the Company's business affairs and integrity, and works with the CEO and other members of senior management to determine the Company's long-term strategy and mission, with the goal of ensuring that the long-term interests of the Company's stockholders are being served.

   1.    The Board oversees risk management, including the Company's compliance with applicable laws and regulations and cybersecurity risk management.

- The Board expects its directors, as well as officers and employees, to act with the highest standards of responsibility, ethics, and integrity.  Directors and officers are expected to be familiar with, and adhere to, the corporate policies on Related Party

---

[1]    *See Uber Corporate Governance Guidelines*, Uber (Feb. 2026), available at https://s23.q4cdn.com/407969754/files/doc_governance/2026/Feb/18/Final-Amendments-to-Corporate-Governance-Guidelines-Feb-2026-a153ec.pdf.

5

Transactions and Conflicts of Interest, the Company's Business Conduct Guide, including, for directors, the provisions that are applicable to directors and the Director Code of Conduct. In addition, employees are expected to be familiar with, and adhere to, the corporate policy on Conflicts of Interest and the Business Conduct Guide.

29. Uber has adopted a Business Conduct Guide (the "Guide") as "a framework for how we do things at Uber — with integrity." According to the Guide:[2]

- "We Do the Right Thing. Period. At Uber, we expect one another to do what is right over what is fast, status quo, fun, easy or comfortable. We engage in difficult conversations required to make the right call; we reflect on Uber's values and use judgment when 'the right thing' isn't obvious; we do what we say we are going to do, and we take accountability and are self-aware."

2. "Reimagine a Better World[.] We reimagine the way the world moves for the better. When we treat everyone with respect, embrace inclusivity, maintain a safe workplace, and make a positive impact in our communities, we're able to grow our business with integrity as One Uber."

3. "Respect everyone. We are committed to fostering an environment where all people are welcome and supported. Uber does not tolerate any form of discrimination, harassment, retaliation, bullying, or workplace violence – from Uber employees or anyone who represents us."

- "Be inclusive. As a company that facilitates movement, our goal is to help everyone move freely, safely, and without fear. To do that, we must maintain an equitable and inclusive workplace, while also building a marketplace where our products and services address the needs of diverse communities."

- "Stand for safety. Safety never stops – it is embedded into everything we do. Our relentless pursuit to make Uber safer for everyone using our platform will continue

---

[2] *See Uber Business Conduct Guide*, Uber, available at https://s23.q4cdn.com/407969754/files/doc_governance/2025/Jun/18/BCG-2024_ENG-a12cc8.pdf.

6

to make us the industry leader for safety. The safety of our employees both in the workplace and outside makes our culture stronger. We know the work of safety never stops, so we can and will challenge ourselves to always be better for the communities we serve."

- "Be Trustworthy[.] Earning the trust of our customers and shareholders is everyone's job at Uber. Our honesty, transparency, and clear communications are how we keep that trust."

- "No insider trading. Insider trading is against the law. It also undermines confidence in the markets. If we have access to material non-public information (MNPI) at work, we must never share it or trade on it."

- "Tell the truth about our products and services. The marketplace expects transparency and trustworthiness from Uber. We create marketing, advertising, and sales materials that accurately represent our company and our products. We act in accordance with the laws and company policies that strictly prohibit deceptive or unfair advertising and practices."

- "Do the right thing: [] Describe Uber, our products, and our services – and even our competitors – in a way that is fair, truthful, and substantiated. [] Be straightforward in how we present ourselves and our platform – relying on data or other evidence to back up our claims. [] Never omit key facts or conditions when promoting Uber."

- "Report accurate and complete financial information. Investors and regulators count on us to provide accurate information to make informed decisions. We must each do our part to make certain that our company records are accurate, complete, and clear."

B.    **Additional Duties of Board Committees**

30.    The Board has adopted a charter for the Audit Committee, whose purpose "is to assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting and controls and certain key corporate governance functions of the Board."

7

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

According to the Audit Committee Charter,[3] the committee's principal functions are to:

- "(i) oversee the quality and integrity of the Company's financial statements and accounting and financial reporting processes, systems of internal control and the audits of the Company's financial statements by the Company's independent auditors (the 'Independent Registered Public Accounting Firm')";

- "(ii) oversee the Independent Registered Public Accounting Firm's qualifications and independence and the performance of the Company's internal audit function and the Independent Registered Public Accounting Firm";

- "(iii) provide risk management and governance oversight"; and

- "(iv) ensure the Company's compliance with legal and regulatory requirements[,]" including "[p]eriodically review the status of any legal matters and/or regulatory changes that could have a significant impact on the Company's financial statements."

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

31.    Uber was founded in 2009 as Ubercab, Inc., and changed its name to Uber Technologies, Inc., in February 2011.  The vast majority of Uber's revenues come from two segments: Mobility, consisting of Uber's iconic ridesharing service and related transportation modalities, such as carsharing, micromobility, rentals, public transit, and taxis; and Delivery, consisting largely of the Uber Eats app, which offers consumers delivery services for groceries, alcohol, convenience items, and other retail goods.[4]

32.    Uber offers a cross-platform membership program, Uber One, which gives members centralized access to both Mobility and Delivery services.  As of December 31, 2025, Uber One counted 46 million members.

33.    Mobility has historically been the largest business segment for Uber, accounting

---

[3]    *See Audit Committee Charter*, Uber (adopted Oct. 30, 2023), available at https://s23.q4cdn.com/407969754/files/doc_downloads/2023/audit-committee-charter-approved-10-30-2023.pdf.

[4]    Uber also operates a Freight business segment, which accounts for less than 10% of Uber's revenues.

for 57% of Uber's revenues in 2024 and 2025.

**B.      Uber's History of Non-Compliance**

34.      Uber's leadership has a long history of devoting insufficient resources to customer safety and protection, and setting a tone of non-compliance for the organization.  This has inevitably led to harm to customers and massive legal and regulatory exposure to Uber.

35.      In 2022, the public learned of some of this history when Uber's former lobbying head in Europe sent a trove of internal documents to the *Guardian*, which, along with other newspapers, reported on Uber's lawbreaking culture from 2013 to 2017, during a period of rapid growth for the Company when Travis Kalanick ("Kalanick"), a co-founder of the Company, was CEO.

36.      In August 2014, an executive in Uber's Indian office messaged fellow colleagues: "Embrace the chaos.  It means you're doing something meaningful."[5]  The executive noted that while Uber "will likely have both local and national issues in almost every city in India" the employees should "get used to this as the status quo[.]"  Before the end of that year, an Uber driver was accused of raping a customer, and following public outcry, Uber was temporarily banned in Delhi.  In another email in 2014, Uber's head of global communications, Nairi Hourdajian, admitted, "sometimes we have problems because, well, we're just fucking illegal."[6]  Uber executives even admitted internally that their evasion of local taxi licensing laws was "extremely strategic" to Uber's "ability to scale the business[.]"[7]  Another executive referred to Uber employees as "pirates."[8]  Other employees referred to Uber's "other than legal status[.]"[9]

37.      Kalanick would send Uber drivers to protests, where they could be exposed to violence, by rationalizing, "Violence guarantee[s] success."[10]  Another executive described this as

---

[5]      Johana Bhuiyan and Dan Milmo, *'Embrace the chaos': a history of Uber's rapid expansion and fall from favour*, GUARDIAN (July 15, 2022), https://www.theguardian.com/news/2022/jul/15/embrace-the-chaos-a-history-of-ubers-rapid-expansion-and-fall-from-favour.
[6]      *Id*.
[7]      *Id*.
[8]      Harry Davies, et al., *Uber broke laws, duped police and secretly lobbied governments, leak reveals*, GUARDIAN (July 11, 2022), https://www.theguardian.com/news/2022/jul/10/uber-files-leak-reveals-global-lobbying-campaign.
[9]      *Id*.
[10]      *Id*. (brackets in original).

9

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

"weaponizing" drivers to "keep the controversy burning."

38.    Instead of complying with its legal obligations, Uber actively tried to obstruct the numerous regulatory investigations into its practices.  It enacted what employees and executives called a "kill switch" to shut off internal computers' access to internal files stored in a centralized location, so that government regulators who seized computers and devices would get computers that were re-set or blacked out.[11]  In response to a 2015 regulatory raid in Amsterdam, Kalanick expressly ordered, "Please hit the kill switch ASAP" and "Access must be shut down in [Amsterdam]."  Furthermore, Uber distributed a detailed "Dawn Raid Manual" to employees with more than 2,600 words and 66 bullet points, including specific instructions to employees on how to respond to regulators, such as "[m]ove the Regulators into a meeting room that does not contain any files" and "[n]ever leave the Regulators alone."  Employees would delay regulators, referred to internally as "unexpected visitors," to give headquarters in San Francisco time to hit the "kill switch."  Using the "kill switch" after regulators already presented documentation, such as warrants, to give them access to documents, was potentially illegal.  As one other executive said, reflecting back on those times, Uber had a "cowboy culture, no governance, improper compliance controls."

39.    Similarly, Uber used "geofencing" technology to block use of the app near police stations and other places where authorities likely would work.  Geofencing enabled the "Greyball" program, also called a "Fake View" by Uber employees.  Greyball, in an effort to obfuscate or mislead authorities, would show "ghost" cars where none was really available, or falsely state that no cars were available.

**C.    The Culture of Non-Compliance Continues**

40.    Ultimately, Kalanick was forced to resign from Uber, and the then-CEO of Expedia, Dara Khosrowshahi, took over as Uber's CEO in September 2017.  Khosrowshahi made cosmetic changes to Uber's compliance practices and workplace culture, and became less brazen in pushing regulatory limits.

---

[11]    Faiz Sidiqui and Joseph Menn, *'Hit the kill switch': Uber used covert tech to thwart government raids*, WASH. POST (July 11, 2022), https://www.washingtonpost.com/technology/2022/07/10/uber-europe-raids-kill-switch/.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

41.    But Uber's culture of prioritizing cost-cutting measures meant that it continued to skimp on compliance or even seek to tamp down on complaints.  In 2019, the *Washington Post* reported that Uber's unit ostensibly dedicated to investigating customer complaints was actually structured to limit the Company's exposure liability.[12]  For instance, the unit's investigators were "forbidden by Uber from routing allegations to police or from advising victims to seek legal counsel or make their own police reports, even when they get confessions of felonies[.]"  Managers were also able to override Uber's three-strikes policy against drivers, and often would when a driver was a high earner for Uber.  When a driver was banned or otherwise found to have engaged in misconduct, Uber would inform neither the police, background check companies, nor other ride-sharing platforms, which often meant that a driver who got kicked off from Uber could simply move to Lyft or another platform.  In response to customer complaints, Uber would often only issue a refund but take no further action.  Investigators were also coached, in their interactions with customers with complaints, to use statements that distanced Uber from liability.

42.    Uber's efforts to avoid customer liability at all costs are reflected in its years-long lobbying campaign at all levels of government to categorize its drivers as independent contractors.  Treating drivers as independent contractors saves Uber substantial amounts of money in pay and benefits, and is a cornerstone in Uber's arguments against customer liability.

43.    To that end, the Company has taken great lengths to appear to not be exerting direct control over the drivers.  This includes taking limited actions against drivers, or providing them with limited training.  In many ways, however, Uber exerts a great deal of control over its drivers.  From the beginning of the Uber-driver relationship, Uber controls what background checks are conducted, the criteria for hiring or terminating drivers from the platform, and what information about each driver to provide to passengers.  Uber continues to control most details of a driver's engagement with the platform, including dictating what rides the driver are assigned, the pick-up and drop-off locations, how much money is paid to the driver, and what routes the driver should

---

[12]    Greg Bensinger, *When rides go wrong: How Uber's investigations unit works to limit the company's liability*, WASH. POST (Sep. 26, 2019), https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

take. Uber provides drivers with decals or other insignia reflecting the Uber brand. Uber also processes all payments from customers and any refunds come from Uber, not the driver. Furthermore, in its own marketing and advertising, Uber makes no attempt to refer to any independence of its drivers, but rather indicates a ride is with Uber itself, relying on messages of safety, consistency, and reliability to potential or current customers.

44. In essence, Uber is trying to have its cake and eat it too—exerting control over its drivers when it suits the Company's bottom line, but pretending it has no such control when it comes to implementing standards to protect its customers. Only when confronted by legal and regulatory action has Uber changed its behavior to reflect the true employee and/or agency relationship with its drivers and the responsibilities to its customers that flow from that relationship.

45. In 2016, Uber was forced to begin to change its customer safety marketing practices. Previously, Uber had claimed to charge a $1 fee as a "safe rides fee" to improve its safety practices. Uber also claimed to conduct "industry leading" and "gold standard" background checks on its drivers, to reassure customers that they were safe getting into a car with a stranger. Uber also emphasized how it was "the safest ride on the road" in its marketing materials. In a pair of settlements—one with a class of customers and another with the San Francisco and Los Angeles district attorneys, Uber was forced to change its public safety messaging. Uber renamed its "safe rides fee" as a "booking fee" to reflect more accurately that the fee went to support Uber's general operations rather than specifically improve its safety processes. Uber also agreed that it would no longer claim that its background checks were "gold standard" or "industry leading," after the district attorneys uncovered numerous instances where its background check had failed to screen out convicts, and after the class discovered that Uber neglected to adopt common background check practices in the taxi industry, such as taking and checking fingerprints or using a "Live Scan" technology that provided up-to-date information about criminal records. Uber agreed to also stop using language in marketing claiming that it was the "safest." Uber also agreed to payments and penalties totaling between $38.5 million to $53.5 million, depending on how it implemented the settlement with the district attorneys.

12

46.     But while Uber changed its marketing, it did not change most of its practices.  As reported by the *New York Times* in 2025: "Uber received a report of sexual assault or sexual misconduct in the United States almost every eight minutes on average between 2017 and 2022, sealed court records show, a level far more pervasive than what the company has disclosed."[13] Uber internal data showed that between 2017 to 2022, a total of 400,181 Uber trips resulted in reports of sexual assault or misconduct.  Uber, however, only publicly disclosed 12,522 complaints of serious sexual assault.  Uber's head of safety for the Americas, Hannah Nilles, told the *Times* in response that about 75% of the reports were for "less serious" sexual misconduct and were unaudited, and thus, she claimed, could include incorrect or fraudulent reports from people seeking refunds.

47.     Uber was internally aware of the problem and spent years studying ways to reduce the number of sexual assault and misconduct incidents.  Uber employees found several effective methods, *which Uber management declined to adopt* because they threatened the independent contractor status of Uber drivers.  For example, Uber refused to deploy cameras in cars, even though taxicabs regularly deploy them, and even though they have been proven to have a deterrent effect and was even suggested by Defendant Khosrowshahi himself shortly after he took over as CEO in 2017.  Employees at the time studied this idea and found the plan to be feasible, cost-effective, likely to reduce the incidence of misconduct, and help drivers.  Uber chose not to go forward with this plan, largely because it would mean exercising greater control over drivers' activities, weakening Uber's argument that its drivers are independent contractors.

48.     Uber also touts its background check system for keeping passengers safe, claiming that all U.S. drivers go through a "rigorous, multi-layer background check."[14]  And the background checks do weed out many drivers who have been convicted of murder, sexual assault, kidnapping, and terrorism.  But the *New York Times* found that in 22 states, Uber does not screen out drivers convicted of most other violent felonies, including child abuse, assault, and stalking, if those

---

[13]     Emily Steel, *Uber's Festering Sexual Assault Problem*, N.Y. TIMES (Aug. 6, 2025), https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html.
[14]     Hannah Nilles, *How We Keep Our Platform Safe: Understanding Uber's Background Checks and Safety Incident Response*, UBER NEWSROOM (Dec. 21, 2025), https://www.uber.com/us/en/newsroom/background-checks/.

13

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

convictions are seven years old or older.[15]  Further, the *Times* found that the background checks were limited to where a person had lived within the past seven years, meaning that if a crime occurred elsewhere, the check might not catch it.

49.    Uber's management knew the limitations of its background check system and considered implementing a more stringent system.  Uber considered expanding the types of felonies which would disqualify a driver, as well as how thorough the check should be, rejecting such safety improvements as in-person interviews and fingerprint checks.  In 2018, Uber's head of safety communications stated in an email, "[w]e are def[initely] not doing everything we can to find out."  And when that executive recommended upgrading Uber's contract with its background check provider, she and another executive were told that the cost—$16.8 million for existing drivers and $15.2 million per year thereafter—was too high.  The changes were not adopted.

50.    Uber's failure to strengthen its background check system allowed drivers through who were later accused by Uber passengers of rape, including one with multiple felony convictions for assault with a deadly weapon, and who had been arrested but not yet charged after an allegation of rape, and another who had eight violent felony convictions beyond the seven-year cutoff.

51.    The scale of the problem was illuminated by an audit of all rideshare drivers in Massachusetts which the commonwealth conducted after it had enacted stricter background requirements.  In all, Massachusetts banned over 8,000 previously approved rideshare drivers, accounting for around 11% of all drivers in the state.

52.    Uber also tested a program which would match women drivers to women passengers, with the indication that it would make both driver and rider feel safer, and induce more women to drive for Uber.  Despite these safety benefits, for years Uber did not roll out this program, because of fears that it would be politically infeasible and expose the Company to reputational and regulatory backlash.  In March 2026, under pressure from litigation losses in passenger safety cases, Uber reversed its stance and announced the availability of the Women Preferences program throughout the United States. The program remains unavailable as to women

---

[15]    Emily Steel, *Uber Cleared Violent Felons to Drive.  Passengers Accused Them of Rape*, N.Y. TIMES (Dec. 22, 2025), https://www.nytimes.com/2025/12/22/business/uber-background-checks-sexual-assault.html.

14

riders and drivers in most of the world, however.

53.    Further undermining any safety efforts at the Company, some Uber employees would attack the credibility of victims, and that, combined with the lack of transparency in public reporting of sexual assaults and misconduct, led to a decrease in morale. In 2019, Andrew Hasbun, an Uber spokesman, told another Uber employee that he had "trashed" rape victims to *USA Today* when it published an account of the sexual assault problem at Uber, commenting further, "I used to look after my soul, but don't know where it is anymore[.]"

54.    Recent lawsuits and government actions show that Uber continues to have inadequate measures to protect customers from: (1) sexual assault and misconduct; (2) discrimination against disabled customers; and (3) deceptive practices in signing up and preventing cancellation of its Uber One subscription service.

55.    On September 24, 2025, the U.S. House Subcommittee on Cybersecurity, Information Technology, and Government Innovation opened an investigation into Uber's handling of sexual harassment and assault allegations. In October 2025, reports stated that the New Jersey Attorney General had opened an investigation into Uber's statements regarding driver and rider safety. On January 6, 2026, Rep. Debbie Dingell of Michigan wrote an open letter to Defendant Khosrowshahi, following up on a previous letter and conversation with the Company. In the letter, Rep. Dingell laid out several questions for Uber regarding their commitment to safety over profits, and the robustness of their background check regime. On January 22, 2026, the New York State Comptroller filed a shareholder proposal on behalf of the New York State Common Retirement Fund, demanding that Uber release a "transparency report" on how it addresses sexual harassment and assault of its riders.

56.    Uber also faces thousands of lawsuits against it from victims of sexual assault and harassment. More than 500 cases are coordinated in the Superior Court of California, San Francisco County.[16] More than 3,000 additional cases are coordinated in federal multi-district litigation ("MDL") presided over by Judge Charles Breyer, U.S. District Judge for the Northern

---

[16]    *In re: Uber Rideshare Cases*, Case No. CJC-21-005188 (Sup. Ct. S.F. Cnty.); *Jane Doe LSA 78 v. Uber Techs. Inc.*, Case No. CGC-21-592427 (Sup. Ct. S.F. Cnty.).

15

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

District of California.[17]

57.    In the first bellwether case in California Superior Court, the jury found Uber to be negligent with respect to its safety prevention procedures, with the jury split on whether Uber's negligence was a substantial factor in causing the harm to the individual plaintiff.  The individual plaintiff, identified as Jessica C., testified that the Uber driver attempted to rape her on a ride to the airport, and only stopped when she received a phone call from her parents.  Damning evidence against Uber that came out during trial included:

- Uber severely underreported the instances of sexual misconduct to the public. Purportedly "less serious" categories of sexual misconduct that Uber did not report publicly included masturbation, verbal threats of sexual assault, and sexual leering.

- A December 2014 email included a comment from an engineer: "We seem to be investing heavily at growth, but are rather slow to move on our core value proposition of safety[.]"

- A member of the operations team, Andrew McDonald, cautioned against placing cameras in cars because of cost and publicity concerns: "We need to be very careful in testing this anywhere.  We do not want this to find its way into regulation.  It would be majorly expensive. . . .  Plus, it begs the question of what we are solving, since we argue everywhere that we are the safest ride on the road without cameras."

- In an October 2017 set of talking points, Uber's Director of Safety Communications, Andrew Hasburn, sought to provide "context" to minimize the impact of reporting the total number of sexual assaults.

- Uber's former product manager, Katherine Parker, admitted that "Uber's business model provides a unique challenge" to implementing safety measures, because to protect the drivers' status as independent directors, Uber had to limit "mandated training and interventions that can be imposed."

---

[17]    *In re: Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB (N.D. Cal.).

16

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Gus Fulder, head of safety at Uber, confirmed that he believed "Uber passengers, they ride Uber at their own risk[.]"  He also was the primary decisionmaker for releasing only a select portion of sexual assault and misconduct data to the public.

- One reason why Uber executives for years running prevented the Company from implementing a program that matched women drivers to riders was they did not want to create a perception that Uber was unsafe for women.  Documents from 2020 and 2021 showed that Uber's safety team supported this program, and a 2022 memo showed that it was being implemented in Australia.  But a 2024 memo raised the concern: "whether a product like this is needed because Uber is not safe for women … especially given media coverage of Uber and sexual assault, safety reports, lawsuits, etc." (ellipsis in original).

58.     Throughout the trial, Uber's counsel repeatedly sought to muddy the waters and sought to introduce evidence of the individual plaintiff's sexual history, intoxication, and her subsequent use of Uber and Lyft, all in an attempt to undermine her credibility and draw responsibility away from Uber.

59.     In the federal MDL proceedings, Uber has lost several motions to dismiss on negligence and common carrier claims because of its control of the platform, misleading safety marketing, and duties to provide safe transport as a common carrier.  The court also declined to dismiss plaintiffs' demand for punitive damages, holding: "Plaintiffs' pleadings . . . are replete with allegations that Uber knew of the risk of sexual assault and intentionally did not take action to prevent it."[18]  In the first bellwether case in the MDL to proceed to trial, a jury awarded the plaintiff $8.5 million in compensatory damages against Uber, finding that the Company was liable through an agency relationship with the driver who committed the assault.  In the second bellwether trial, the jury found that the Uber driver had committed battery against the plaintiff and awarded $5,000 in damages.  The court had previously ruled that Uber was a common carrier under North Carolina law, meaning it had a "non-delegable duty" to ensure passenger safety, and that

---

[18]     *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. Aug. 15, 2024), ECF No. 1044.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Uber was therefore liable. As these cases continue to play out, Uber faces liability into the hundreds of millions, if not billions, of dollars.

60. Uber's disregard for its legal obligations extends beyond the safety of its riders. Uber has also long had a problem of discriminating against disabled passengers in violation of the ADA. In November 2021, the U.S. Department of Justice ("DOJ") filed a lawsuit against Uber for violating the ADA by charging wait time fees beginning two minutes after a car arrived at the pickup location, which was often insufficient time for disabled riders.[19] The parties settled the case in July 2022, with Uber agreeing to waive wait time fees for a period of two years for disabled riders, and credit riders double the amount of wait time fees they had been charged, plus about an additional $2.3 million in compensation.

61. Instead of taking this settlement as an opportunity to improve its practices, Uber continued to engage in, or create conditions for, other discriminatory practices against disabled passengers, exposing Uber to further liability under the ADA. The DOJ filed a new suit against Uber in September 2025, alleging numerous ADA violations by Uber and its drivers, for, among other things: 1) routine refusal of service to individuals with disabilities, including those who require the assistance of service animals; 2) impermissible surcharges purportedly for cleaning and cancellation fees; and 3) refusing to reasonably modify policies, practices, and procedures to avoid discriminating against riders with disabilities.[20] The new DOJ lawsuit detailed numerous examples affecting specific passengers, and further notes: "All the above discriminatory conduct flows directly from and is exacerbated by Uber's broader failures to prevent discrimination against individuals with disabilities or provide meaningful relief to those it harms."[21] Uber's systematic misconduct as alleged includes:

- "Uber has notice of the widespread disability-based discrimination in its transportation services, yet has failed to prevent it."

---

[19] Complaint, *U.S. v. Uber Techs. Inc.*, No. 3:21-cv-08735 (N.D. Cal. Nov. 10, 2021), ECF No. 1.
[20] Complaint, <u>U.S.</u> *v. Uber Techs., Inc.*, No. 3:25-cv-07731 (N.D. Cal. Sep. 11, 2025), ECF No. 1.
[21] *Id.* ¶274.

- "Uber does not adequately train its drivers or customer service representatives about their ADA obligations, including how to properly assist and treat individuals with disabilities who use Uber's transportation service in a respectful and courteous way."

- "Uber does not adequately monitor its drivers to prevent disability-based discrimination."

- "Uber fails to independently review and verify that its drivers have not improperly charged riders additional fees or surcharges because the riders use service animals or mobility devices or for other disability-related reasons."

- "Nor does Uber adequately address and remedy complaints of discrimination by, for example, removing drivers who discriminate from its platform or by otherwise effectively penalizing or training those drivers to ensure they do not discriminate in the future."[22]

62. Much of the misconduct the DOJ alleges in its ADA suit mirrors the process failures in the sexual misconduct suits. The DOJ also alleges that Uber takes a hands-off approach to its drivers when they engage in practices that violate the law, and purposely does not train them in the law, so that Uber can claim that the drivers are merely contractors that Uber has little or no control over. The DOJ is seeking monetary damages and civil penalty, in addition to injunctive relief.

63. On March 5, 2026, the court denied Uber's motion to dismiss, finding that the DOJ sufficiently alleged a pattern or practice of discrimination by Uber.[23]

64. Uber also harms its customers through violations of consumer protection statutes. Uber deceives its users by tricking them into signing up for its loyalty program and subscription service, Uber One, and then making it virtually impossible to cancel.

65. In April 2025, the Federal Trade Commission ("FTC") filed a lawsuit against Uber for violating Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and Section 4 of the Restore Online

---

[22] *Id*. ¶¶275–79.
[23] Order on Motion to Dismiss, <u>U.S. v. Uber Techs., Inc.</u>, No. 3:25-cv-07731 (N.D. Cal. Mar 5, 2026), ECF No. 27.

19

Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §8403, subsequently joined by 22 states alleging violations of their respective state consumer protection statutes (the "FTC Action"), regarding Uber's subscription service Uber One.[24]

66.    Uber describes Uber One as a subscription option that gives subscribers access to discounts across Uber and Uber Eats, and other benefits such as $0 delivery fees.  Uber One offers monthly memberships for $9.99 and annual memberships for $96.  Uber One subscriptions automatically renew, charging subscribers unless they cancel by a certain date.

67.    The FTC Action alleges that Uber deceptively enrolls and charges users of Uber One without their consent, and then fails "to provide a simple method to cancel Uber One, employing a series of obstacles that compound to deter and prevent consumers from stopping recurring charges."[25]

68.    Uber One enrolls some users without their consent.  In one example described in the FTC Action, the Uber app presents screens with pop-up advertisements inviting users to "Claim offer" with extra promised savings.[26]  Clicking on the offer leads to a "Try Uber One" banner with $9.99 crossed out, and a check-out button labeled "Try for free."[27]  Once consumers click that button, they are automatically enrolled in Uber One, and are automatically charged after the trial period and on a recurring basis after that.[28]

69.    Even users who intend to subscribe are given false promises.  To entice customers to sign up for the subscription, Uber promises $25 monthly savings, free delivery, and the ability to cancel "anytime."  These representations are deceptive, as many consumers do not save $25 per month, some users report paying for delivery fees, and users cannot cancel "anytime" without paying undisclosed fees.[29]  This cancellation process requires a consumer to "take at least 12 different actions and navigate a maze of at least 7 screens, if they guess the right paths to use,

---

[24]    *FTC v. Uber Techs. Inc.*, No. 3:25-cv-03477-JST (N.D. Cal. filed Apr. 21, 2025) ("FTC Action").
[25]    Amended Complaint, *FTC v. Uber Techs. Inc.*, No. 3:25-cv-03477-JST (N.D. Cal, May 4, 2026), ECF No. 199 ¶5.
[26]    *Id.* ¶26.
[27]    *Id.* ¶27.
[28]    *Id.* ¶28.
[29]    *Id.* ¶¶22–24.

20

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

despite there being no mention of cancellation until the fourth screen." And if a customer seeks to cancel within 48 hours of the next billing date, they may need "to take as many as 32 actions and navigate as many as 23 screens, if they guess the right paths to use and only go through the loop described below once. Even after that, they have had to contact customer service."[30]

70. Furthermore, Uber appears to co-opt its customer service department in extracting fees, as "Uber One's customer service representatives are encouraged to make the 'cancel anytime' representation to consumers who contact Uber to inquire about enrolling in Uber One."[31] Further, "even when consumers are able to reach Uber's customer service, the representatives have taken so long to respond to and effectuate consumers' cancellation requests that consumers end up being charged again without their consent."[32]

71. The FTC notes that Uber engaged in these deceptive practices despite: (1) public knowledge of more than a dozen similar actions previously brought by the FTC against other companies for violating the Federal Trade Commission Act of 1914 and ROSCA with their deceptive subscription practices, including Amazon and Adobe; (2) a "public outpouring" of complaints from Uber One users; (3) a September 2024 letter from the FTC asking about Uber's deceptive subscription practices; and (4) Uber's previous interactions with the FTC for deceptive consumer practices, including two prior consent orders regarding Uber's advertising and data security practices.[33] Uber's failure to comply with these state and federal consumer protection laws is thus a major failure of compliance and governance.

72. In a discovery hearing in April 2026, counsel for the FTC indicated that the amount of money in dispute in the case is likely at least nine figures, with significant additional liability for the states' allegations.[34] For context, a similar pattern of misconduct alleged by the FTC against Amazon for its deceptive Prime subscription service sign-up and cancellation processes resulted

---

[30]    *Id.* ¶5.
[31]    *Id.* ¶21.
[32]    *Id.* ¶5.
[33]    *Id.* ¶¶91–92.
[34]    Dorothy Atkins, *Uber Must Give FTC, States Contact Info On 30M Subscribers*, Law360 (Apr. 10, 2026), https://www.law360.com/articles/2464142.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

in a $2.5 billion settlement two days into a trial.[35]  Thus, Uber's deceptive practices could expose the Company to substantial liability.

## VI.     BOARD CULPABILITY

73.     Prior to filing this complaint, Plaintiff demanded and received certain nonpublic internal books and records from the Company, under Delaware law.  In total, Uber produced over 3,550 pages of documents to Plaintiff. ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

74.     ███████████████████████████████████████████████████

███████████████████████

75.     ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

76.     ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

77.     ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████

78.     The Board also approached safety in a reactive, not proactive, way. ██████████

---

[35]     FTC press release, *FTC Secures Historic $2.5 Billion Settlement Against Amazon*, Fed. Trade Comm'n (Sep. 25, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-secures-historic-25-billion-settlement-against-amazon.

22

79. ████████████████████████████████████

████████████████████████████████████████

80. ████████████████████████████████████

████████████████████████████████████████

██████

81. ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████

████████████

████████████

████████████

████████████

████████████████████

82.     This decreasing commitment to safety is reflected in the Company's evolving approach to its U.S. Safety Report, often touted as evidence of Uber's commitment to safety, which has gotten progressively shorter, less informative, and less timely in each iteration. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████

83.   ████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████

84.   ████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████  ████████  ████████  ████████
████████  ████████  ████████  ████████
████████████████████████████

85.   ████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████

86.   ████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

24
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

87.     ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

## VII.     SECURITIES LAW VIOLATIONS

88.     Uber's fiduciaries have acted disloyally to the Company by causing it to violate Section 14(a) of the Exchange Act, along with its attendant rules and regulations.

89.     The 2026 annual meeting proxy was filed with the SEC on March 23, 2026 (the "2026 Proxy"), in advance of the annual meeting on May 4, 2026.   In it, the Defendants recommended, among other things, that Uber's shareholders: (1) elect or re-elect directors; and (2) approve executive compensation.   The 2026 Proxy contains several material misrepresentations about customer safety and service, as well as the Board's role in overseeing Uber's overall compliance with laws and regulations.

90.     For example, Defendant Sugar's letter to shareholders as Chairperson states: "We remain as committed as ever to serving our stockholders and the millions of people who interact with our platform every day."

91.     The body of the 2026 Proxy contains numerous material misrepresentations as well:

Board of Directors' Role in Safety Oversight

The Board maintains active oversight of safety through regular reporting to the full Board and its committees, embedding safety within the Company's enterprise risk management framework, aligning executive compensation with safety performance metrics, and engaging with stockholders and independent advisors.

[. . .]

Uber's governance evolution

When we made "Stand for safety" a core value at Uber, we committed to building a culture where safety guides how we operate, grow, and evolve. That commitment has developed alongside the structural and governance reforms our Board of Directors instituted as we transitioned from a venture-backed private company to a large-cap public company.

25

Uber is now available in over 70 countries, and our market cap has grown. As we scale, we have continued to strengthen oversight structures, transparency, and governance practices to match our expanding global footprint. These enhancements are designed to support accountability, disciplined risk management, and a sustained focus on long-term value creation. As the business has grown in scale and complexity, the Board has kept safety central to its oversight of the Company.

One indicator of these efforts is that, of the billions of trips completed on the Uber platform each year, 99.9% have ended without any reported safety incident at all.

As part of our commitment to transparency, Uber was the first company in the rideshare industry to publish a comprehensive safety report.

We continue to evolve our approach to safety responsibly and to lead our industry in safety reporting. We evaluate our reporting processes with a focus on accuracy, methodological integrity, and appropriate timing. Uber engages RALIANCE (a national partnership dedicated to ending sexual violence) to provide independent validation of its accuracy in application of the Sexual Misconduct and Violence Taxonomy on identified incidents, and its motor vehicle fatality data is independently validated and cross-referenced against data released by the National Highway Traffic Safety Administration. The compilation and validation of safety metrics involve significant operational and methodological rigor, which can impact reporting timelines, but we have continued to publish a U.S. Safety Report every two years and intend to publish a fourth U.S. Safety Report in 2026.

[. . .]

Board of Directors' oversight of safety

Uber's directors bring broad experience that directly informs the Board's rigorous oversight of safety strategy, controls, and performance. This includes expertise in global operations, cybersecurity, government, policy and regulatory, innovation and high growth, enterprise risk management, and technology innovation.

The Board's oversight focuses on three areas (with safety considerations embedded in each):

| Leadership | Overseeing CEO and senior leadership performance (including progress toward and attainment of safety goals) and succession planning to support the Company's long-term strategy. |
|---|---|
| Strategy | Overseeing management's execution of the Company's long-term strategy and ensuring that the Company remains strongly positioned in a dynamic regulatory and competitive environment (including investment in and development of new and enhanced safety tools on our platform). |
| Risk | Overseeing enterprise risk management, including compliance with applicable laws and mitigation of financial, legal, operational, and reputational risks (including oversight of safety performance and disclosures). |

The Board believes this framework supports strong governance, robust oversight, and the long-term interests of stockholders.

26

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

[. . .]

Safety reporting to the Board

Safety oversight is ingrained at the highest levels of our organization. Our Board of Directors and senior management recognize the fundamental importance of safety to our business, which is why "Stand for safety" is a core company value and a central component of our operations and strategy.

Safety leadership regularly provides significant safety updates to the full Board, as well as to the Audit Committee. These briefings include review of Uber's safety strategy, product and technology enhancements designed to improve safety outcomes, regulatory and legislative developments across key jurisdictions, trends in critical safety incidents, incident-response protocols, and the effectiveness of mitigation measures and risk controls.

Through these discussions, the Board and its committees oversee safety performance and continual improvement initiatives across the Company's global operations. The Audit Committee oversees enterprise risk management processes, including safety-related risk controls and reporting systems, while the Nominating and Governance Committee oversees governance policies, practices, procedures, and compliance, including updates regarding safety accountability.

In addition to regular updates, the Board and relevant committees receive prompt reporting on significant safety incidents, trends, and regulatory developments, and management escalates material matters to the Board as appropriate. This supports timely oversight and informed Board engagement on emerging risks.

These updates provide the Board insight into Uber's Global Safety Management System and address key elements of our safety program, including Uber's safety policies, risk management controls, safety assurance processes, critical-incident reviews, and matters related to our Community Guidelines. Topics include motor-vehicle and physical-assault fatalities, serious sexual assaults, and the mitigation measures we have implemented to reduce risk and strengthen safety outcomes.

Safety is also regularly discussed as part of Board-level strategy and risk reviews. Through this structure, safety oversight is embedded within the Board's broader responsibilities for leadership, strategy, and enterprise risk management.

During regular Board meetings in 2025, directors engaged with senior leadership on safety-related matters across the business, including, among other items:

| Technology advancements | Product safety developments | Mobility-related operational updates | Dedicated safety briefings |
|---|---|---|---|
| Senior Engineering leaders | Chief Product Officer | Head of Mobility | Head of Safety |

| Regulatory and legal developments | Public policy considerations | Enterprise risk management updates |
|---|---|---|

27

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Chief Legal Officer | Chief Marketing Officer and Senior Vice President of Public Affairs | Senior leadership, including the CEO, Chief Legal Officer, and Chief Financial Officer |
|---|---|---|

The Board continually evaluates safety governance practices and refines oversight structures as the Company's scale, technology, and regulatory environment evolve.

[. . .]

Management's role in safety governance

Uber's Executive Leadership Team maintains enterprise-wide accountability for safety performance and is responsible for the deployment, implementation, and continual improvement of Uber's Global Safety Management System. This safety risk management framework is anchored in four pillars—safety policy and objectives, safety promotion, safety risk management, and safety assurance—and provides a consistent, global approach to identifying and addressing risks, refining mitigations, and fostering a culture that prioritizes safety.

Safety leadership regularly coordinates with internal and external committees, working groups, industry experts, and advisory boards to incorporate diverse expertise and regional and global perspectives. This structure supports collaboration, nuanced and risk-informed governance, and the consistent implementation of safety strategy across global operations.

The most effective way for Uber to promote safety is through robust preventative measures and clear enforcement mechanisms.

[. . .]

Safety improvement performance tied to executive compensation

Since 2018, a portion of Uber's executive incentive compensation has been directly tied to measurable improvements in global safety outcomes, including reductions in critical safety incidents such as critical sexual assaults and motor vehicle crash fatalities. In 2021, we expanded our approach to include global incident rates across our Mobility and Delivery businesses. This structure reinforces accountability at the most senior levels, supports keeping safety performance a core leadership priority, and aligns executive incentives with Uber's long-term safety strategy.

[. . .]

Stockholder engagement

We believe that proactive, transparent, and constructive engagement with stockholders is essential to effective governance. Throughout the year, we engage with stockholders through structured in-season and off-season discussions, as well as ongoing engagements requested by stockholders, to discuss a range of strategic priorities, including safety.

In 2025, we routinely engaged on safety-related topics with stockholders. These conversations provided valuable insights that inform our strategy, enhance transparency, and help ensure that our safety priorities remain responsive to evolving stockholder expectations and operating environments.

28

The Nominating and Governance Committee is routinely briefed on stockholder feedback and engagement regarding safety matters. The committee, in turn, reports relevant stockholder feedback to the full Board to support ongoing evaluation of the Board's oversight of safety and the Company's overall safety governance approach.

[. . .]

The role of Uber's independent Safety Advisory Board

We established an independent Safety Advisory Board in 2015 to provide external expertise and counsel on our safety strategy, governance, processes, and technologies. Chaired by former U.S. Secretary of Homeland Security Jeh C. Johnson, the Safety Advisory Board includes leaders and experts in gender-based-violence prevention, domestic-violence prevention, road safety, public health, workplace health and safety, and law enforcement.

Since its inception, the Safety Advisory Board has helped shape Uber's safety initiatives, including the Company's approach to safety reporting, the creation of industry-first programs such as the Industry Sharing Safety Program, and the development of in-app safety features including the Emergency Button and Live Help from a Safety Agent. The Safety Advisory Board engages with Uber's Safety leadership semiannually and with other members of the Executive Leadership Team periodically to provide independent guidance, review strategic priorities, and support the continued strengthening of Uber's safety governance framework.

[. . .]

Ongoing Board oversight of safety

Uber's Board of Directors recognizes that safety is fundamental to Uber's long-term success and to the trust that Riders, Drivers, Merchants, and communities worldwide place in us. Through regular reporting and escalation protocols, integration of safety in our enterprise risk management framework, alignment with executive compensation, and engagement with independent advisors and stockholders, the Board maintains active, structured, and informed oversight of safety matters.

The Board remains firmly aligned with Management's priorities in continually strengthening Uber's safety governance practices and anchoring safety as a core strategic and operational priority in support of sustainable long-term stockholder value.

[. . .]

Incentive Plan Goals

Continued focus on safety and autonomous vehicles

- Remain invested in safety and transparency – remaining 10% of 2026 PRSUs allocated to safety improvement goals

[. . .]

Examples of What We Heard in 2025

29

Encouraged to share additional disclosure regarding Uber's safety protocols, safety technologies, and the Board's oversight of these initiatives

We enhanced our disclosures to highlight our ongoing investments in safety for Drivers, Couriers, and Riders. Demonstrating our commitment to transparency, we provided deeper insights into our rigorous background screening processes, strategic safety partnerships, and innovative product features, including the U.S. launch and expansion of Women Preferences. Furthermore, we included expanded discussion of the Board's governance and oversight of safety within this proxy statement. We also plan to provide further details in our forthcoming Governance Strategy and Engagement Report, and intend to publish our fourth U.S. Safety Report this year.

[. . .]

Director Skills, Experience & Background

**Government, Policy, and Regulatory Experience**

Experience navigating a complex legal and regulatory landscape worldwide. [Uber claims that six of its 10 directors have such experience.]

[. . .]

The Board's Roles & Responsibilities

**Board Oversight**

Our Board oversees our business affairs and works with senior management to determine our long-term strategy. A transparent dialogue between our Board, its standing committees, and senior management is essential to our Board's oversight role, and, to this end, our Board and its standing committees regularly conduct meetings with risk management experts and our senior officers responsible for risk oversight, including our Chief Legal Officer; Chief Ethics, Compliance & Security Officer; Chief Financial Officer; and Chief Executive Officer. Our Audit Committee oversees our risk management procedures and processes for preventing and detecting fraud.

[. . .]

Other Governance Policies & Practices

**Promoting Integrity**

At Uber, we do the right thing. Period. We foster an environment where we hold ourselves to the highest standards of integrity by communicating regularly and educating often about ethics and expected standards of conduct. We celebrate the importance of ethical decision-making and doing the right thing, particularly during our annual Ethics & Compliance Week when we remind employees about their responsibility to raise concerns or questions regarding ethics, compliance, workplace culture, and harassment.

[. . .]

Looking Ahead to 2026

30

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Continued focus on safety and AVs.** We remain invested in the prioritization of safety and transparency and fulfilling our AV commitments in 2026. As such, the 10% of our 2026 PRSUs not tied to financial performance will be awarded based on the achievement of predetermined safety improvement goals."[36]

92.    The 2025 annual meeting proxy was filed with the SEC on March 24, 2025 (the "2025 Proxy"), in advance of the annual meeting on May 5, 2025.  In it, the Defendants recommended among other things that Uber's shareholders: (1) elect or re-elect directors; and (2) approve executive compensation.  The 2025 Proxy contains several material misrepresentations about customer safety and service, as well as the Board's role in overseeing Uber's overall compliance with laws and regulations.

93.    For example, Defendant Sugar's letter to shareholders as Chairperson states: "In 2024, we published our third U.S. Safety Report, reflecting our continued commitment to safety[. . . .] We remain as committed as ever to serving our stockholders and the millions of people who interact with our platform every day."

94.    The body of the 2025 Proxy contains further misrepresentations as well:

It is imperative that Uber's Board has the skills, knowledge, and expertise to oversee issue areas that are most important to our stockholders. Our Board recognizes that effective management of and governance over Uber's fundamental risks and opportunities is key to our long-term success as a company and delivering value to our stockholders. Our Board is actively engaged in overseeing such risks and opportunities so that they can effectively provide feedback on our overall strategy, commitments, and specific risks that may arise from our business and operations.

[. . .]

The Audit Committee oversees a variety of ethics and compliance matters and receives regular reports from the Chief Ethics, Compliance, & Security Officer. These reports include updates on our compliance with applicable laws and regulations and our compliance framework and program development, including oversight of our systems and controls for ethical behavior and the prevention of bribery. Additionally, the Audit Committee is informed of and oversees the investigation and follow-up (including disciplinary action) of any instances of material non-compliance, including violations of Uber's Business Conduct Guide. This oversight includes the review of any ongoing examinations by regulatory authorities and the Company's response. The Audit Committee regularly briefs the entire Board on these matters.

[. . .]

---
[36]    *See* Uber Techs. Inc., Proxy Statement (Sched. 14A) (Mar. 23, 2026) (all emphasis in original).

31

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

The Board and Audit Committee oversee risk management, including Uber's compliance with applicable laws and regulations. The Board receives regular updates from our Chief Legal Officer and our Chief Marketing Officer and SVP, Public Affairs. Regulatory issues are also discussed with the Board multiple times each year through our Enterprise Risk Management program.

[. . .]

The Board receives updates at least annually and is actively engaged in user safety. The Board and Audit Committee oversee risk management, including user safety. The Board and management deeply understand the importance of safety, which is why safety is tied to our Company values and is a performance metric included in our executive compensation program. Our Senior Vice President of Core Services and our Head of Safety report to the Board on Uber's Safety Management System, including updates on Uber's safety policies, safety risk management, controls, and safety assurance, including reporting on critical safety incidents like motor vehicle fatalities, physical assault fatalities, and critical sexual assaults.

[. . .]

Director Skills, Experience & Background

**Government, Policy, and Regulatory Experience**

Experience navigating a complex legal and regulatory landscape worldwide.  [Uber claimed that six of 10 then-directors held such experience.]

[. . .]

The Board's Roles & Responsibilities

**Board Oversight**

Our Board[] oversees our business affairs and works with senior management to determine our long-term strategy. A transparent dialogue between our Board, its standing committees, and senior management is essential to our Board's oversight role, and, to this end, our Board and its standing committees regularly conduct meetings with risk management experts and our senior officers responsible for risk oversight, including our Chief Legal Officer; Chief Ethics, Compliance & Security Officer; Chief Financial Officer; and Chief Executive Officer. Our Audit Committee oversees our risk management procedures and processes for preventing and detecting fraud.

[. . .]

Other Governance Policies & Practices

**Promoting Integrity**

At Uber, we do the right thing. Period. We foster an environment where we hold ourselves to the highest standards of integrity by communicating regularly and educating often about ethics and expected standards of conduct. We celebrate the importance of ethical decision-making and doing the right thing, particularly during our annual Ethics & Compliance Week when we remind employees about their

32

responsibility to raise concerns or questions regarding ethics, compliance, workplace culture, and harassment.[37]

95.     The 2024 annual meeting proxy was filed with the SEC on March 25, 2024 (the "2024 Proxy"), in advance of the annual meeting on May 6, 2024.  In it, the Defendants recommended among other things that Uber's shareholders: (1) elect or re-elect directors; and (2) approve executive compensation.  The 2024 Proxy contains several material misrepresentations about customer safety and service, as well as the Board's role in overseeing Uber's overall compliance with laws and regulations.

User Safety: We firmly believe our work on safety is never done. Safety is a priority for those using our platform through continuous in-and-out of app safety features and strive to help create a safe environment and reduce incidents that impact the physical safety of our users.

[. . .]

The Board receives updates at least annually and is actively engaged in user safety. The Board and management deeply understand the importance of safety, which is why safety is tied to our Company values and is a performance metric for each of our most senior executives. Our Senior Vice President of Core Services and our Head of Safety reports to the Board on Uber's Safety Management System, which can include updates on Uber's safety policies, safety risk management and controls, and safety assurance, including reporting on critical safety incidents like motor vehicle fatalities, physical assault fatalities, and critical sexual assaults.

[. . .]

In 2022, we published our second U.S. Safety Report to track our progress, drive accountability, and strengthen safety on our platform and beyond. In 2023, we updated our ESG Report to, among other things, highlight our global safety management system (SMS), which shapes and defines our commitment to safety. Our commitment to enhance our disclosures of Uber's work on safety will be reflected in our forthcoming disclosures.

[. . .]

Director Skills, Experience, & Background

Government, Policy, and Regulatory Experience

Experience navigating a complex legal and regulatory landscape worldwide. [Uber claimed that 6 of 11 then-directors had such experience.]

Corporate Governance Policies & Practice

**Promoting Integrity**

---

[37]     *See* Uber Techs. Inc., Proxy Statement (Sched. 14A) (Mar. 24, 2025) (all emphasis in original).

33

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

At Uber, we do the right thing. Period. We foster an environment where we hold ourselves to the highest standards of integrity by communicating regularly and educating often about ethics and expected standards of conduct. We celebrate the importance of ethical decision-making and doing the right thing, particularly during our annual Ethics & Compliance Week where we remind employees about their responsibility to raise concerns or questions regarding ethics, compliance, workplace culture, discrimination, and harassment.

[. . .]

How the Board Oversees Culture

The Board and its committees play a critical role in overseeing how we develop and maintain the culture that we want.

**Audit Committee**

- Receives reports from the Chief Ethics and Compliance Officer and Global Head of Internal Audit no less than quarterly regarding the Company's Integrity Helpline[.]

- Is given information regarding all reports that come through the Integrity Helpline, including the nature of the reports, how the reports are resolved, and whether any reports involve senior management or individuals associated with financial reporting[.]

- Ensures that the resolution of any and all allegations regarding wrongdoing involving members of senior management are reported back to the Audit Committee[.]

- Regularly meets in executive session with the Chief Ethics and Compliance Officer, the Global Head of Internal Audit, the Chief Legal Officer, and our external audit partner to discuss any compliance, internal audit, or legal issues that involve senior management[.]

[. . .]

Strategic Goals & rTSR Modifier

***Safety Improvement Goals.*** Standing for safety has been a critical component of our executive compensation program since 2018. The consistent inclusion of safety improvement goals in our PRSU program has ensured our NEOs are prioritizing the safety of users and consumers on our platform. While we have historically evaluated our safety improvement goals by analyzing our safety performance results as it relates to our U.S. Mobility business, in 2021, we expanded our measurement of our safety improvement goals to review safety incident rates globally, in both our Mobility and Delivery businesses (see footnote four to the "2021 PRSUs Three Year Strategic Targets" table below for additional information). This shift has continued through our 2023 PRSU program and marks our continued investment and prioritization of safety and transparency on a global level and goes beyond industry practice.

[. . .]

**2021 PRSU Awards - Three-Year Strategic Targets and Results (2021–2023)**

34

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

The Compensation Committee established the DEI and safety improvement strategic targets at the beginning of 2021 to be measured at the end of the three-year performance period for the 2021 PRSU Awards.

[. . .]

*Safety Improvement.* Uber surpassed its goal for reducing the rate of sexual assaults globally. We observed a substantial decrease in Latin America (LatAm) markets, such as Mexico and Brazil, while other major markets across the globe in Europe, Middle East, and Africa (EMEA), Asia Pacific (APAC), and the U.S. remained flat or are starting to increase as we continue to emerge from the COVID-19 pandemic. Uber's platform often reflects broader societal trends, and the motor vehicle fatality rates, which continue to be heavily impacted by varying societal shifts across the globe following the COVID-19 pandemic, are an example of that. While globally, official data from the World Health Organization noted a decrease in fatal crashes during the COVID-19 pandemic, official data from the National Highway Traffic Safety Administration shows significant increases in 2020, 2021, and 2022 vs. pre-pandemic levels across the U.S. (*see data released for 2020-2021 and 2022 by NHTSA*). We plan to continue to include safety improvement goals in our PRSU program, as part of our broader commitment to safety, accountability, and transparency.

| 4.    Safety Improvement[(1)(4)] | 10% | | 74% | 7.4% |
|---|---|---|---|---|
| Percent of reduction Critical Sexual Assault[(4)] | 5% | (10.0)% | 148.0% | 7.4% |
| Percent of reduction in Motor Vehicle Crash Fatalities[(4)] | 5% | (10.0)% | 0% | 0% |

[(1)] *Achievement of DEI and safety improvement goals may take into consideration the impact of certain M&A transactions.*

[(2)] *Results as of January 31, 2024 (inclusive of promotions in early 2024 related to 2023 performance).*

[(3)] *Further discussion of the achievement of our DEI strategic targets can be found in our forthcoming 2024 ESG Report.*

[(4)] *Safety improvement performance measure defined by the Company's safety incident rate over the baseline year of 2020, as measured in reductions in global motor vehicle crash fatalities and global critical sexual assaults over a three-year period. This measurement has expanded and goes beyond what is reported in our U.S. Safety Reports, including but not limited to: (i) geographic scope: for all PRSUs prior to the 2021 PRSUs, this performance measurement has focused on U.S. incidents but will now include global safety incidents. Due to the inclusion of global incidents, U.S. FARS reconciliation is not a prerequisite for analytical results; (ii) line of business expansion: to date, this performance measurement has focused on incidents within our Mobility business, but will now include Delivery motor vehicle fatality incidents as well. All safety incidents in scope are subject to our safety data auditing processes, which can be found on pages 45 - 46 of our 2022 U.S. Safety Report.*"[38]

---

[38]    *See* Uber Techs. Inc., Proxy Statement (Sched. 14A) (Mar. 25, 2024) (all emphasis in original).

35

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VIII.   DAMAGE TO THE COMPANY

96.    As a result of the above-described wrongdoing, Uber has been the subject of thousands of civil lawsuits, as well as governmental investigations and litigation.

97.    Uber faces significant liability in defending these suits and responding to inquiries, in addition to the hundreds of millions of dollars at stake.  Uber has also seen its reputation irredeemably damaged by the negative ongoing media coverage of the wrongdoing.

98.    Uber has granted millions of dollars in executive incentive compensation to fiduciaries who breached their duties to Uber.

## IX.     DERIVATIVE ALLEGATIONS

99.    Plaintiff brings this action derivatively in the right of, and for the benefit of, Uber to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

100.    Plaintiff will adequately and fairly represent the interests of Uber and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.  Plaintiff has continuously held Uber stock throughout the Relevant Period and will continue to hold Uber stock through the resolution of this action.

101.    Plaintiff has not made a pre-suit demand on the Board to assert the claims set forth herein against the Individual Defendants because such a demand would have been futile, and is thereby excused, since the allegations herein, at minimum, permit the inference that the Board lacks the requisite disinterest to determine fairly whether these claims should be pursued.

102.    In preparing to file this action, Plaintiff conducted an investigation by inspecting internal books and records under Section 220.  As a result, Plaintiff has adequately informed itself as to the merits and as to whether making a demand on the Board would be futile.

103.    Plaintiff made its Section 220 demand on October 16, 2025.  The Company and Plaintiff executed a confidentiality agreement on November 10, 2025.  In response to Plaintiff's demand, Uber made four productions of documents on December 18, 2025, February 6, 2026, and March 31, 2026.  These productions totaled four documents and 3,556 pages.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

104.    As explained below, demand is futile because a majority of the Board faces a substantial likelihood of liability due to their failure to provide oversight to prevent and remedy: (1) consumer protection violations in general, and pervasive safety practices in particular; and (2) false and misleading statements in violation of Federal and state securities laws.

## X.    DEMAND FUTILITY ALLEGATIONS

105.    A demand on the Board to bring the claims asserted herein would be a futile and useless act because there is a reasonable doubt that a majority of the current 10-member Board is capable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

106.    All 10 members of the Board have received reports concerning Uber's (1) consumer protection violations in general, and pervasive safety practices in particular; and (2) false and misleading statements in violation of Federal and state securities laws.  However, the Director Defendants ignored these red flags and did not conduct any more extensive oversight, or otherwise remedy or try to prevent this wrongdoing.  As a result, the Director Defendants are condoning illegal conduct by Uber, and that "ostrich-like" behavior constitutes a bad-faith breach of their fiduciary duties to the Company.  By breaching their fiduciary duties, these Director Defendants face a substantial likelihood of liability.  That substantial likelihood of liability, as a result, makes at least half of these Director Defendants interested and not independent in whether they can assess a demand for litigation against them or the Officer Defendants, who are alleged to have engaged in the same misconduct.  As a result, making a demand on these Director Defendants is futile.

## XI.    CLAIMS FOR RELIEF

**COUNT I**
**Breach of Fiduciary Duty**
**<u>Against All Individual Defendants</u>**

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

108.    The Individual Defendants each owe (and owed) Uber and its shareholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

37

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

109.    As detailed above, the Individual Defendants breached their fiduciary duties by permitting Uber, its directors, and officers to violate Federal and state consumer protection and securities laws, as well as Uber's own policies and guidelines.

110.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Uber has been damaged, not only monetarily, but also with regard to its corporate image and goodwill, as well as the damages caused by continued violations of law.

111.    As a result, Plaintiff brings this claim on behalf of Uber to remedy Individual Defendants' violations of law.

112.    Plaintiff, on behalf of Uber, has no adequate remedy at law.

## COUNT II
### Corporate Waste
### Against the Individual Defendants

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

114.    By rewarding themselves through the payment of outsized incentive compensation while causing Uber to violate the law, the Individual Defendants have caused Uber to waste valuable corporate assets.

115.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Uber has been damaged, not only monetarily, but also with regard to its corporate image and goodwill, as well as the damages caused by continued violations of law.

116.    As a result, Plaintiff brings this claim on behalf of Uber to remedy Individual Defendants' violations of law.

117.    Plaintiff, on behalf of Uber, has no adequate remedy at law.

## COUNT III
### Unjust Enrichment
### Against the Individual Defendants

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

119.    As a result of the misconduct described herein, the Individual Defendants will be, and have been, unjustly enriched at the expense of the Company and its shareholders.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

120. All incentive compensation payments and stock sale proceeds granted, authorized, approved, and/or received by the Individual Defendants were at the expense of Uber. The Company was inadequately compensated for these payments and stock sale proceeds.

121. As a direct and proximate result of the Individual Defendants' unjust enrichment, Uber has been damaged, not only monetarily, but also with regard to its corporate image and goodwill, as well as the damages caused by continued violations of law.

122. As a result, Plaintiff brings this claim on behalf of Uber to remedy Individual Defendants' violations of law.

123. Plaintiff, on behalf of Uber, has no adequate remedy at law.

**COUNT IV**
**Violation of §14(a) of the Exchange Act**
**Against All of the Director Defendants**

124. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

125. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

126. The Director Defendants exercised control over Uber and caused Uber to disseminate the false and misleading Proxy Statements.[39] The Proxy Statements materially misrepresented Uber's commitment to, and Individual Defendants' oversight and management of, rider safety, disability law compliance, and consumer protection statutes.

127. As stated herein, the Proxy Statements contained untrue statements of material facts

---

[39] The 2024, 2025, and 2026 Proxy Statements are collectively referred to as the "Proxy Statements."

39

and omitted material facts necessary to make the statements that were made not false and misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. These false statements and omissions were essential links in the re-election of each of the directors, formed the basis of the Company's shareholders' "say-on-pay" vote, as well as the shareholders' approval of the Company's long-term incentive plan, and the continued mismanagement of Uber.

128. The written communications made by the Individual Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

129. At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, the Individual Defendants were aware of, and/or had access to, the facts concerning Uber's alleged user safety and consumer protection practices in violation of federal and state laws.

130. Uber, as a result, has been injured by this conduct and is entitled to damages and equitable relief.

**COUNT V**
**Violation of §29(b) of the Exchange Act**
**<u>Against All of the Director Defendants</u>**

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

132. The Director Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act. The Director Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because these Defendants violated §14(a) by issuing false and misleading reports to Uber shareholders regarding the nature of, and responsibility for, violations of federal and state law and regulations and the Company's own policies and procedures. All of the payments the Director Defendants received are therefore voidable by Uber under §29(b) of the Exchange Act.

133. Uber is in privity with the Director Defendants with respect to the incentive compensation and fees provided by Uber to these Defendants. The Director Defendants have

40
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

engaged in prohibited conduct in violation of the securities laws as alleged herein.

134. Uber has been severely injured by the misconduct of the Director Defendants. Accordingly, Uber is entitled to damages, i.e., rescission of the incentives, compensation, and fees granted to the Director Defendants.

## XII.    PRAYER FOR RELIEF

135. WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Uber and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties of care and loyalty to Uber;

C.    Determining and awarding to Uber the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

D.    Awarding to Uber restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them, including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds;

E.    Directing Uber to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein, including, but not limited to, the following specific relief:

(i)    improving measures to prevent and remedy practices in violation of federal and state consumer protection and securities laws as well as Uber's own internal policies and guidelines; and

(ii)    requiring the Company to implement additional audit, compliance, and internal control procedures;

41

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest; and

H.    Granting such other and further relief as the Court deems just and equitable.

## XIII.  JURY DEMAND

136.   Plaintiff demands a trial by jury.

Dated: June 22, 2026

SCOTT+SCOTT ATTORNEYS AT LAW LLP

 s/ Joseph A. Pettigrew
Joseph A. Pettigrew (CA 236933)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jpettigrew@scott-scott.com

Jing-Li Yu (CA 342985)
Donald A. Broggi (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jyu@scott-scott.com
dbroggi@scott-scott.com

Geoffrey M. Johnson (*pro hac vice* forthcoming)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

*Counsel for Plaintiff Police and Fire Retirement System of the City of Detroit*

42

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, David Cetlinski, do hereby declare:

1.      I am the Executive Director of the Police and Fire Retirement System of the City of Detroit ("Detroit"), located in Detroit, Michigan, and am duly authorized to act on behalf of Detroit.

2.      Detroit is a derivative plaintiff in the above-titled action.  I verify that I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint"), to be filed in this action and that the facts stated in the Complaint, as they concern Detroit, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.      Detroit has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Detroit; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the __12th__ day of ___June___, 2026.

David Cetlinski, Executive Director
POLICE AND FIRE RETIREMENT SYSTEM
OF THE CITY OF DETROIT
Detroit, Michigan